**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **FARRELL L. BOSTIC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:06CV140 CAS(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Farrell L. Bostic for Disability Insurance Benefits under Title II of the

Social Security Act, and Supplemental Security Income under Title XVI of the Act. The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of

Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the

Answer. (Doc. No. 14).

**Procedural History**

On September 15, 2004, plaintiff filed his application for benefits, claiming that he became

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time
Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue
became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action.
See Fed.R.Civ.P. 25(d)(1).

unable to work due to his disabling condition on August 26, 2004. (Tr. 39-42, 110-112). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 5, 2006. (Tr. 32-36, 88-92, 8-18). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on July 26, 2006. (Tr. 5, 2-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

### A. **ALJ Hearing**

Plaintiff's administrative hearing was held on December 6, 2005. (Tr. 190). Plaintiff was present and was represented by counsel. (Id.). Plaintiff's wife, Sandra Bostic, and a vocational expert, Dr. John E. Grenfell, were also present. (Id.). The ALJ began by admitting the exhibits into the record. (Id.). Plaintiff's attorney stated that he had not obtained recent medical records from Dr. Dick Newell. (Tr. 191). The ALJ indicated that he would leave the record open for a month to allow plaintiff time to obtain additional medical records. (Tr. 193).

Plaintiff's attorney then examined plaintiff, who testified that he was 49 years of age and had a seventh grade education. (Tr. 194). Plaintiff stated that he was able to read and write. (Id.). Plaintiff testified that he was married and that he did not have any children at home. (Id.). Plaintiff stated that he has had three employers in his life. (Id.). Plaintiff testified that he first worked for Fairmont Cab Company in Dexter, Missouri, as a presser for twenty years. (Tr. 194-95). The ALJ indicated that plaintiff's work history report was in the file and that it was not necessary to recite plaintiff's work history. (Tr. 195).

Plaintiff testified that he left his most recent employment with W. W. Wood Products in August 2004 due to health problems. (Id.). Plaintiff stated that he was experiencing pain in his chest, hands, and feet, and was dropping things. (Id.). Plaintiff testified that W. W. Wood Products manufactured cabinet doors and that he was dropping doors and ruining them. (Id.). Plaintiff stated that he was laid off because he was unable to perform his job due to his health. (Tr. 196).

Plaintiff testified that he is unable to work due to arthritis[2] in his hands, legs, arms, and shoulders. (Id.). Plaintiff stated that he also experiences chest pain but he has not been able to undergo testing recommended by his doctor because he does not have insurance. (Tr. 197). Plaintiff testified that his doctor gave him a bottle of Nitroglycerin,[3] which resolves his chest pain. (Id.). Plaintiff stated that he was given the Nitroglycerin about a year prior to the hearing, and that he took all of the Nitroglycerin within a year and had it refilled. (Tr. 198). Plaintiff testified that he does not take the Nitroglycerin every day but only takes it when he experiences chest pain. (Id.). Plaintiff stated that he had Nitroglycerin in his pocket during the hearing. (Id.).

Plaintiff testified that he has difficulty breathing and that he becomes winded easily. (Id.). Plaintiff stated that his breathing problems started after he began working at W. W. Wood Products spraying stain. (Id.).

Plaintiff testified that his arthritis is the main problem that prevents him from working. (Id.). Plaintiff stated that the arthritis affects his ability to walk. (Id.). Plaintiff testified that he is

[2]Inflammation of a joint. Stedman's Medical Dictionary, 159 (28th Ed. 2006).

[3]Nitroglycerin is indicated for the acute relief of an attack or acute prophylaxis of angina pectoris due to coronary artery disease. See Physician's Desk Reference (PDR), 2569 (57th Ed. 2003).

able to walk one block before he runs out of breath and experiences pain in his legs and feet. (Tr. 199). Plaintiff stated that he is able to stand for ten to twenty minutes before he has to sit down due to pain. (Id.).

Plaintiff testified that he has difficulty carrying items such as a cup of coffee because he drops them. (Id.). Plaintiff testified that he drops cups of coffee two to three times a month. (Tr. 200). Plaintiff stated that he cannot lift anything heavier than a gallon of milk. (Id.). Plaintiff testified that he cannot control his hands if he tries to lift anything heavier than a gallon of milk. (Id.).

Plaintiff stated that he has a driver's license and that he drives a car about once a week. (Id.). Plaintiff testified that he drives to his mother's house, which is about five miles from his house. (Tr. 201). Plaintiff stated that he only drives once a week because his hands start hurting and "give out." (Id.).

Plaintiff testified that he does not perform any yard work. (Id.). Plaintiff stated that he does not go to church, coffee shops, taverns, or otherwise go out socially. (Id.). Plaintiff testified that he does not visit anyone other than his mother. (Id.). Plaintiff stated that he is able to dress himself sometimes but he occasionally has difficulty lifting his arms above his head to put on shirts and fastening buttons on his shirts. (Id.).

Plaintiff testified that on a typical day, he gets up at 7:00 a.m. (Tr. 202). Plaintiff stated that he wakes up throughout the night. (Id.). Plaintiff testified that after he wakes up, he sits for a while and then lies down. (Id.). Plaintiff stated that he experiences pain in his shoulders, feet, hands, and legs during the day. (Id.). Plaintiff testified that he usually does not eat three meals a day. (Id.). Plaintiff stated that he has difficulty sleeping due to pain. (Id.). Plaintiff testified that

- 4 -

he used to enjoy working on cars but he can no longer do this. (Tr. 203). Plaintiff stated that he sits around and watches television during the day. (Id.).

Plaintiff testified that he does not have health insurance and he does not have a medical card. (Id.). Plaintiff stated that he applied for a medical card but his application was denied. (Id.).

Plaintiff testified that his fingers occasionally turn white and that his doctor has not told him what causes this. (Id.).

Plaintiff stated that he has lost weight over the past two to three years. (Tr. 204). Plaintiff testified that he weighed 100 to 110 pounds at the time of the hearing. (Id.). Plaintiff stated that he is five feet, six inches tall. (Id.). Plaintiff testified that his normal weight is 140 to 150 pounds. (Id.). Plaintiff stated that his doctor has not told him the cause of his weight loss. (Id.).

The ALJ then examined plaintiff, who testified that he was referring to Medicaid when he stated that he had been denied a medical card. (Tr. 205). Plaintiff stated that his wife used to work outside the home but she was laid off in July of 2005. (Id.). Plaintiff testified that he drew unemployment after he was laid off. (Id.). Plaintiff stated that he did not know the dates he received unemployment benefits. (Tr. 206).

Plaintiff testified that he undergoes EKGs when he sees Dr. Newell. (Id.). Plaintiff stated that Dr. Newell recommended that plaintiff undergo further testing for his heart but he was unable to because he does not have insurance or the funds to pay for the tests. (Tr. 207). Plaintiff testified that he did not know what tests Dr. Newell recommended. (Id.). Plaintiff stated that he lives in Bloomfield, which is 45 minutes to an hour south of Cape Girardeau. (Id.). Plaintiff

testified that Dr. Newell did not recommend that plaintiff go to a specific hospital for the testing. (Tr. 208). The ALJ indicated that some hospitals, such as University Hospital in Columbia, offer free services for indigent persons. (Id.).

Plaintiff testified that he has not been called back to work since he was laid off. (Id.). Plaintiff stated that his employer eventually told him that they did not have a position for him. (Id.).

Plaintiff testified that Dr. Newell has diagnosed him with arthritis. (Id.). Plaintiff stated that he has also seen a doctor at a hospital in Cape Girardeau, who prescribed medication for his arthritis. (Tr. 209). Plaintiff testified that his arthritis first started bothering him in his arms, hands, feet, and legs seven to eight years prior to the hearing. (Id.).

Plaintiff stated that he is able to sit for a couple hours. (Id.). Plaintiff testified that he is able to bend, stoop, and squat from a standing position. (Tr. 210). Plaintiff stated that he is able to pick up items from the floor if he can hold onto something. (Id.). Plaintiff testified that he is not able to walk up and down stairs because he experiences pain in his legs and feet. (Tr. 211).

Plaintiff stated that he takes blood pressure medication but he did not know the name of the medication. (Id.). Plaintiff testified that he takes Celebrex[4] for his arthritis. (Id.).

Plaintiff stated that he does not cook or barbecue. (Id.). Plaintiff testified that his wife does all the cooking. (Tr. 212). Plaintiff stated that he does not wash dishes. (Id.). Plaintiff testified that his wife has always washed the dishes. (Id.). Plaintiff stated that he does not garden or do any yard work. (Id.). Plaintiff testified that he does not vacuum, sweep, or dust. (Id.). Plaintiff stated that he used to help with these chores but he is unable to now due to pain in his

---

[4]Celebrex is indicated for relief of the signs and symptoms of arthritis. See PDR at 2590.

legs, arms, shoulders, and feet. (<u>Id.</u>). Plaintiff testified that he has been unable to help with the laundry for the past six years. (Tr. 213).

Plaintiff stated that he worked as a hat presser for twenty years, from about 1975 to 1995. (Tr. 213-14). Plaintiff testified that he left this position due to a disagreement with his employer about his pay. (Tr. 214). Plaintiff stated that the most he earned at this position was about $19,000.00. (<u>Id.</u>). Plaintiff testified that he could not perform this position at the time of the hearing because he cannot grip. (Tr. 215).

Plaintiff stated that he does not visit any friends or relatives other than his mother. (<u>Id.</u>). Plaintiff testified that he visits his mother once a week. (<u>Id.</u>). Plaintiff stated that he does not go out to eat, to the movies, or engage in any other social activities. (<u>Id.</u>). Plaintiff testified that people visit him at his house about once a month. (<u>Id.</u>). Plaintiff stated that when he has visitors, they just talk and do not play any games. (Tr. 216).

Plaintiff's attorney then examined plaintiff's wife, Sandra Bostic, who testified that she has been married to plaintiff for twenty years. (<u>Id.</u>). Mrs. Bostic stated that she had heard plaintiff's testimony and that she agreed with it. (Tr. 217).

Mrs. Bostic testified that she occasionally helps dress plaintiff because he is unable to lift his arms above his head. (<u>Id.</u>). Mrs. Bostic stated that plaintiff's knuckles and hands swell and become red and he is unable to move his hands. (<u>Id.</u>). Mrs. Bostic testified that she has to fasten plaintiff's pants and button his shirts. (Tr. 218). Mrs. Bostic stated that plaintiff is unable to lift his arms above his head. (<u>Id.</u>). Mrs. Bostic testified that plaintiff lost quite a bit of weight. (<u>Id.</u>). Mrs. Bostic stated that plaintiff's fingers turn white during cold weather. (<u>Id.</u>). Mrs. Bostic testified that plaintiff's joints swell about once a week for two to three days. (<u>Id.</u>).

Mrs. Bostic stated that she worked at Jack's Deli in Bernie, Missouri, until she was recently laid off. (Tr. 219). Mrs. Bostic testified that her income from Jack's Deli was the household's only income other than the unemployment funds plaintiff received. (Id.). Mrs. Bostic stated that she does not receive disability benefits or any other income. (Id.).

Mrs. Bostic testified that she has observed plaintiff's weight loss but none of plaintiff's doctors have discussed plaintiff's weight loss. (Id.). Mrs. Bostic stated that plaintiff is unable to eat some foods because he has difficulty swallowing. (Tr. 220). Mrs. Bostic testified that she cuts plaintiff's meat in small pieces. (Id.). Mrs. Bostic stated that plaintiff has been experiencing difficulty swallowing for over a year. (Id.). Mrs. Bostic testified that she has discussed this problem with Dr. Newell and Dr. Newell indicated that he would have to run more tests on plaintiff. (Id.). Mrs. Bostic stated that she was willing to take plaintiff to Columbia for testing. (Id.).

Mrs. Bostic testified that plaintiff tosses and turns all night and complains of pain. (Id.). Mrs. Bostic stated that she occasionally sleeps on the couch because her movement in bed hurts plaintiff. (Tr. 221). Mrs. Bostic testified that she helps plaintiff out of bed about twice a month. (Id.).

Mrs. Bostic stated that plaintiff used to help her with the housework. (Id.). Mrs. Bostic testified that plaintiff no longer helps with the housework because he is unable to grip objects. (Tr. 222). Mrs. Bostic stated that when plaintiff attempts to help with chores he drops objects on the floor. (Id.). Mrs. Bostic testified that plaintiff requires assistance to stand back up when he stoops down. (Id.). Mrs. Bostic stated that they stopped visiting their children in Tennessee because plaintiff was in too much pain after the two-hour car drive. (Id.).

The ALJ next examined Mrs. Bostic, who testified that her children live two to two-and-a-half hours away in Lexington, Tennessee. (Tr. 223). Mrs. Bostic stated that she receives unemployment benefits in the amount of $130.00 a week. (Id.). Mrs. Bostic testified that she has been receiving unemployment benefits since August of 2004. (Id.). Mrs. Bostic stated that plaintiff received unemployment benefits until June of 2005. (Tr. 224).

The ALJ then examined the vocational expert, Dr. John E. Grenfell, who testified that he had heard the testimony in this matter and had reviewed the exhibits. (Id.). The ALJ asked Dr. Grenfell to assume a hypothetical individual of plaintiff's age, education, training, past relevant work experience, and with the following limitations: lift and carry the equivalent of a gallon of milk; sit no more than one to two hours at a time; stand no more than ten to twenty minutes at a time; walk no more than one block at a time; no bending from a standing position to the floor to pick up an item unless there were a table, chair, or something to push himself up with; and no regular and frequent stair climbing or descending. (Tr. 225). Dr. Grenfell testified that such an individual would not be able to perform any of plaintiff's past relevant work because all of plaintiff's past jobs were light in nature and required standing and walking full-time. (Id.).

Dr. Grenfell stated that the individual could perform sedentary jobs, such as production inspection, which is unskilled, and involves picking up small items to inspect them and see if they meet manufacturer specifications. (Id.). Dr. Grenfell testified that there are 1,100 such positions in Missouri and 40,000 in the national economy. (Id.). Dr. Grenfell stated that he was eliminating assembly jobs. (Id.).

Dr. Grenfell testified that the individual could work as a surveillance systems monitor, which is unskilled and involves watching banks of television sets in hospitals, department stores,

and hotels. (Id.). Dr. Grenfell stated that there are 4,000 such positions in Missouri and 110,000 in the national economy. (Tr. 226).

Dr. Grenfell testified that the hypothetical individual could also work as a copy machine operator making copies for banks, insurance companies, and industrial concerns. (Id.). Dr. Grenfell stated that there are 800 such positions in Missouri and 26,000 in the national economy. (Id.).

The ALJ next asked Dr. Grenfell to add the limitation that the individual would have difficulty buttoning bottons or performing similar fine dexterity activities with the fingers. (Id.). Dr. Grenfell testified that this limitation would preclude the jobs he had described. (Id.).

The ALJ then asked Dr. Grenfell to add to the first hypothetical the limitation of not working with the arms overhead. (Tr. 227). Dr. Grenfell testified that this limitation would not preclude the jobs he had described. (Id.).

The ALJ indicated that he would make a decision after he received the additional medical records from plaintiff. (Id.).

**B.    Relevant Medical Records**

The record reveals that plaintiff presented to the Southeast Missouri Hospital Emergency Room on September 21, 1998, with complaints of joint pain. (Tr. 172-73). Plaintiff reported on and off pain in his joints for the past three weeks. (Tr. 172). Upon physical examination, plaintiff had moderate swelling to the wrist, tender knees, no joint effusions, and no gross deformities. (Id.). An x-ray of the cervical[5] spine revealed no fractures. (Id.). Plaintiff was given Toradol,[6]

---

[5]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic

which caused a fifty percent improvement in his pain. (Id.). The impression of the examining

physician was arthritis. (Tr. 173). Plaintiff was prescribed Indocin[7] and Vicoprofen[8] and was

discharged. (Id.).

Plaintiff presented to Dick J. Newell, D.O., on October 12, 1998, with complaints of

severe joint pain. (Tr. 169-70). Dr. Newell's assessment was: (1) symptoms "suspicious for

rheumatoid arthritis,"[9] although the diagnosis is "still in doubt;" (2) high white count with a left

shift-etiology unknown; (3) smoker with COPD;[10] and (4) chest pain. (Tr. 169). Dr. Newell

prescribed Ceclor.[11] (Id.).

Plaintiff saw Dr. Newell on October 21, 1998, at which time he reported his arthritis pain

_____

vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See Medical Information Systems for Lawyers, § 6:27.

[6]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level. See PDR at 2944.

[7]Indocin is indicated for the treatment of moderate to severe rheumatoid arthritis. See PDR at 2013.

[8]Vicoprofen is indicated for the short-term management of acute pain. See PDR at 514.

[9]A generalized disease, occurring more often in women, which primarily affects connective tissue. Arthritis is the dominant clinical manifestation, involving many joints, especially those of the hands and feet, accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular cartilages, which become eroded. Stedman's at 160.

[10]Abbreviation for chronic obstructive pulmonary disease, which is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. Stedman's at 554.

[11]Ceclor is indicated for the treatment of infection. See PDR at 1832.

was considerably better.  (Tr. 166-67).  Dr. Newell's assessment was: increased leukocytosis[12] with a left shift-resolved; and what appeared to be acute rheumatoid arthritis, symptoms almost completely resolved.  (Tr. 166).  Dr Newell continued plaintiff on Ceclor and gave him some Darvocet[13] for pain.  (Id.).

Plaintiff saw Dr. Newell on November 11, 1998, with complaints of increased pain with the cold and damp weather, particularly in the hands, arms, and shoulders.  (Tr. 165).  Dr. Newell indicated that plaintiff had previously undergone a cortisone shot, which provided relief.  (Id.). Dr. Newell's assessment was acute rheumatoid arthritis.  (Id.).  Dr. Newell administered a cortisone shot.  (Id.).

Plaintiff presented to Dr. Newell on January 22, 2001, with complaints of severe pain in his left side.  (Tr. 162).  Dr. Newell's assessment was: (1) left pleural effusion[14]-etiology uncertain; (2) left upper quadrant pain and chest pain, possibly related to pleurisy; and (3) tobacco dependence.  (Id.).  Dr. Newell recommended that plaintiff not work for two days and consume hot fluids.  (Id.).

Plaintiff presented to Regina Lewis, R.N. on March 22, 2001, with complaints of arthritis pain.  (Tr. 158).  Plaintiff reported pain and stiffness in his knees, shoulders, elbows, and hands that he has had for some time.  (Id.).  Plaintiff indicated that he had been told his pain was

---

[12]An abnormally large number of leukocytes, as observed in acute infections, inflammation, hemorrhage, and other conditions.  Stedman's at 1075.

[13]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 3504.

[14]Increased fluid in the pleural space (the membrane enveloping the lungs and lining the walls of the pulmonary cavities); can cause shortness of breath by compression of the lung.  See Stedman's at 616.

arthritis. (Id.). Upon physical examination, plaintiff had full strength and range of motion of the extremities and no inflammation of the joints. (Id.). Ms. Lewis' assessment was arthralgia[15] (Id.). Plaintiff was prescribed Vioxx.[16] (Id.).

Plaintiff presented to Dr. Newell on March 29, 2001, at which time he was very upset and nervous. (Tr. 157). Plaintiff indicated that he was going through marital problems and problems at work. (Id.). Plaintiff requested medication for depression. (Id.). Plaintiff was not suicidal. (Id.). Dr. Newell prescribed Effexor.[17] (Id.).

Plaintiff presented to Dr. Newell on July 10, 2003, with complaints of chest pain. (Tr. 186). Upon examination, plaintiff had a regular heart rate and rhythm. (Id.). Dr. Newell's assessment was hypertension[18] and COPD secondary to smoking. (Tr. 187). He advised plaintiff to stop smoking. (Id.).

Plaintiff saw Dr. Newell on January 7, 2004, with complaints of fever and gastrointestinal problems. (Tr. 184). Dr. Newell diagnosed plaintiff with gastroenteritis[19] and hypertension. (Tr. 185).

Plaintiff saw Dr. Newell on February 10, 2004, with complaints of vertigo and chest pains. (Tr. 182). Plaintiff's blood pressure was 130/92 and he weighed 131 pounds. (Id.). Dr. Newell

---

[15]Pain in a joint. Stedman's at 159.

[16]Vioxx is indicated for the relief of signs and symptoms of rheumatoid arthritis. See PDR at 2122.

[17]Effexor is indicated for the treatment of depression. See PDR at 3392.

[18]High blood pressure. Stedman's at 927.

[19]Inflammation of the mucous membrane of both stomach and intestine. Stedman's at 791.

diagnosed plaintiff with hypertension and rheumatoid arthritis. (Tr. 183).

Plaintiff presented to Dr. Newell on February 19, 2004 for hypertension management. (Tr. 180). Plaintiff reported that he was feeling better. (Id.). Plaintiff's blood pressure was 126/94, and he weighed 134 pounds. (Id.). Dr. Newell diagnosed plaintiff with hypertension and told plaintiff to quit smoking. (Tr. 181).

Plaintiff presented to Dr. Newell on April 15, 2004, for hypertension management. (Tr. 178). Plaintiff complained of pain "all over," and requested a sample of Celebrex. (Id.). Plaintiff weighed 134 pounds and his blood pressure was 112/80. (Id.). Dr. Newell diagnosed plaintiff with hypertension and rheumatoid arthritis. (Tr. 179).

Plaintiff presented to Dr. Newell on August 31, 2004, with complaints of hypertension, chest pain, and arm and leg pain. (Tr. 176). Plaintiff indicated that he was trying to get on disability. (Tr. 177). Dr. Newell diagnosed plaintiff with hypertension-stable, and a possible syncopal[20] episode. (Id.).

On December 19, 2005, plaintiff presented to Dr. Newell for medication refills. (Tr. 152). Plaintiff indicated that he was trying to get disability. (Id.). Plaintiff weighed 130 pounds and his blood pressure was 144/92. (Tr. 152). Dr. Newell noted pain and limited mobility in plaintiff's hands. (Tr. 153). Dr. Newell diagnosed plaintiff with hypertension, COPD, chest pain, rheumatoid arthritis, and tobacco dependence. (Id.). He told plaintiff to decrease his smoking. (Id.).

---

[20]Loss of consciousness and postural tone caused by diminished cerebral blood flow. Stedman's at 1887.

# The ALJ's Determination

The ALJ made the following findings:

1.  The claimant does not meet the non-disability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since August 26, 2004.

3.  The claimant has a severe combination of impairments, including: hypertension, breathing difficulties, cardiac impairments, and limitations to the use of his knees, shoulders, elbows, and hands.

4.  These medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant is found credible to the extent of and the claimant's residual functional capacity and limitations are found to be a limitation to lifting and carrying no more than the equivalent of a gallon of milk, with no requirement to walk more than one block at one time, no requirement to stand more than 10 to 20 minutes at one time, no requirement to sit more than one to two hours at one time, with no bending, stooping, or squatting to the floor from a standing position unless there is a chair table, or something similar available to push or pull himself back up with, with no regular or frequent stair climbing or descending, and no work with his arms overhead.

7.  The claimant is a "younger individual."

8.  The claimant has a limited education.

9.  The claimant has past relevant work as a factory worker.

10. The claimant has no transferable skills from his past relevant work.

11. Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, a finding of "not disabled" is appropriate within the framework of Medical-Vocational Rule 201.18.  There are a significant number of jobs in the state and national economies that the claimant could perform. Examples of such jobs include unskilled production inspection, surveillance system monitor, and copy machine operator.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 17).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on August 30, 2004, the claimant is not entitled to a Period of Disability, Disability Insurance Benefits, and is not eligible for Supplemental Security Income payments under sections 216(i), 223, 1602, and 1614(a)(3)(A) respectively, of the Social Security Act.

(Tr. 18).

## Discussion

### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry."
Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.
See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.
See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.**     **Plaintiff's Claims**

Plaintiff raises two claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and limitation.  Plaintiff next argues that the ALJ erred in formulating his residual functional capacity. The undersigned will discuss plaintiff's claims in turn.

1.    **Credibility Determination**

Plaintiff argues that the ALJ erroneously found his subjective complaints of pain and limitation not credible. Specifically, plaintiff contends that the ALJ improperly required objective evidence of pain. Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully

- 19 -

credible when [ ]he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 15). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first discussed the medical evidence. The ALJ found that the medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ first pointed out that none of plaintiff's treating physicians have imposed any limitations on plaintiff. The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

The ALJ noted that plaintiff failed to seek treatment from August 30, 2004, until December 19, 2005, two weeks after his hearing. (Tr. 13). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ also noted that plaintiff failed to undergo further testing recommended by his treating physician, citing lack of insurance, although the record does not document that plaintiff

was ever refused treatment due to insufficient funds. (Tr. 13). If a claimant is unable to follow a prescribed regimen of medication and therapy to combat his difficulties because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992). The fact that a claimant is under financial strain, however, is not determinative. Id. A claimant's alleged failure to seek treatment due to financial difficulties is not credible when the claimant did not attempt to obtain any low-cost medical treatment. Id. at 386-87. Here, as the ALJ points out, there is nothing in the record to indicate that plaintiff was denied treatment due to lack of finances or that he attempted to obtain low-cost treatment.

The ALJ properly noted that plaintiff continued to smoke despite his physician's advice to stop smoking and despite his complaints of shortness of breath. (Tr. 14). The medical records reveal that Dr. Newell repeatedly advised plaintiff to quit smoking. (Tr. 153, 181, 187). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

During the hearing, plaintiff testified that he received unemployment benefits after being laid off from his last position. (Tr. 205). The application for unemployment benefits requires an assertion of the ability to work and is facially inconsistent with a claim of disability. Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994). As such, the fact that plaintiff applied for and received unemployment benefits, thereby holding himself out as able to work, detracts from his credibility.

Plaintiff also testified that he had lost a significant amount of weight and that he weighed only 100 to 110 pounds at the time of the hearing. (Tr. 204). On December 19, 2005, however,

about two weeks after the hearing, plaintiff weighed 130 pounds. (Tr. 152). This inconsistency detracts from plaintiff's credibility.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating his residual functional capacity. Specifically, plaintiff contends that the ALJ failed to assess the combination of his impairments in determining his residual functional capacity. Defendant argues that the ALJ properly formulated plaintiff's residual functional capacity.

After properly assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> Giving the claimant the benefit of the doubt regarding most of his alleged complaints and limitations the claimant is found credible to the extent of and the claimant's residual functional capacity and limitations are found to be a limitation to lifting and carrying no more than the equivalent of a gallon of milk, with no requirement to walk more than one block at one time, no requirement to stand more than 10 to 20 minutes at one time, no requirement to sit more than one to two hours at one time, with no bending, stooping, or squatting to the floor from a standing position unless there is a chair, table, or something similar available to push or pull himself back up with, with no regular or frequent stair

climbing or descending, and no work with his arms overhead.

(Tr. 16).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

The ALJ's residual functional capacity assessment is supported by the record as a whole, including the objective medical evidence. Notably, none of plaintiff's treating physicians imposed any functional limitations on plaintiff. The objective medical record is consistent with the ability to perform a limited range of sedentary work. The record is not supportive of any greater restriction due to plaintiff's impairments.

The ALJ's residual functional capacity assessment is also consistent with plaintiff's own testimony regarding his limitations. Plaintiff testified that he was able to carry objects weighing up to the equivalent of a gallon of milk, walk one block, stand 10 to 20 minutes, sit for a couple of hours, and bend to the floor only if he could hold onto something for assistance. (Tr. 200, 199, 209, 210). The ALJ incorporated all of these limitations into plaintiff's residual functional capacity. Plaintiff fails to point to a specific limitation that was not taken into account by the

ALJ.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

### **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act be **affirmed**.

The parties are advised that they have eleven (11) days, until March 3, 2008, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this __21st__ day of February, 2008.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE